## WILLSON v. IMPERIAL FERTILIZER CO.

1. CASE—EQUITY.—THE AGENT of a party contracting to sell fertilizers
   under the circumstances here, used reasonable care and prudence in
   selling the fertilizers in bulk on market instead of to the country
   trade.

2. EVIDENCE—LETTER—ACCOUNTING—CARE—PRINCIPAL AND AGENT.—A
   letter from one fertilizer company to another, who was using its
   brands, claiming the right to terminate their use on demand, is
   competent on question of prudence and care on the part of the agent
   of the latter in closing out contract for sale of fertilizers.

3. EXCEPTION.—Amplification of exception so as to question admissi-
   bility of evidence excluded by master, to which there is no excep-
   tion, will not be permitted.

4. WAIVER.—One contracting party waives his right to object to the
   assignment by the other party of a contract to sell fertilizers because
   of its personal nature by his active co-operation in procuring such
   assignment.

5. ACCOUNTING—PRINCIPAL AND AGENT—TRUSTS.—The agent of a party contracting to sell fertilizers, under the facts in this case, is liable to his principal for the difference between the price at which he could have sold the goods and the price at which he did sell them; but the contracting seller to the principal and its assignee are not jointly liable with such agent, because the sale was made to such assignee, it being found as a fact that they did not act in a fiduciary capacity in bringing about the appointment of such agent.

Before GAGE, J., Charleston, September, 1902. Modified.

Action by W. N. C. Willson, committee of Willson Griffith, against Imperial Fertilizer Co., Virginia-Carolina Chemical Co. and W. J. Smith. The contract out of which the action arises is as follows:

"Charleston, S. C., June 26th, 1899.

"Mr. Willson Griffith, lessee, Charleston, S. C.

"Dear sir: We will the ensuing season make and deliver to your order to be sold for *our* account your brands of fertilizers and acid phosphates with and without potash, upon the following terms, prices and conditions in bulk, f. o. b. cars at our works, in not less than carload lots; we to furnish bags, branded as you may direct, at the cost of seven cents each, and to furnish the inspection tags, charging you the cost of same, according to the States into which the goods are shipped:

|  | Per ton. |
| --- | --- |
| 9-2-2 fertilizer | $12 25 |
| 8-2½-1 fertilizer | 12 25 |
| 9-2-1 fertilizer | 11 45 |
| 10-1-1 fertilizer | 9 50 |
| 13 per cent. dissolved bone | 6 25 |
| 13 per cent. dissolved bone (double milled) | 6 40 |
| 10-1 acid phosphate | 6 50 |
| 10-2 acid phosphate | 6 85 |
| 10-2 acid phosphate (for wheat) | 7 05 |
| 10-4 acid phosphate (for cotton) | 8 75 |
| 10-4 acid phosphate (for wheat) | 9 05 |
| 8-4 acid phosphate (for cotton) | 8 05 |

—all goods to be shipped in good mechanical condition. The 8-4 acid to be made, however, as per your request, entirely of kainit for the potash, you taking any risk that may accrue as to the mechanical condition of this grade.

"The above prices are upon a basis of May 1st, 1900, any goods paid for prior to May 1st, a discount at the rate of 7 per cent. per annum will be allowed you from date of payment to May 1st; any goods closed by note payable in the fall of 1900, interest at the rate of 7 per cent. per annum to be added from May 1st, to date of maturity of the notes.

"You agree herewith to guarantee all sales to the extent of your aggregate profit on each group, to wit: for all goods sold payable between this date and the 1st of January, 1900, to be considered as the first group; all goods payable May 1st, 1900, the second, and all goods closed by note payable in the fall of 1900, the third.

"All settlements, whether in cash or by notes of the purchaser, are to be made direct with you, and you hereby agree that as such settlements are made, you will at once when cash is paid, turn over to us the gross amount received from purchasers, and when settlements are made by note, you will deliver to us the notes of said purchasers, payable to your order as lessee of the Etiwan Phosphate Works, duly endorsed by you, settlement to be made by us for your interest in said accounts in accordance with the following paragraphs.

"All collaterals taken on time accounts to be delivered also to us, duly endorsed when necessary, and said collaterals to be returned to you in the fall to be sent out for collection in accordance with contracts. When all the sales that are due on or about January 1st, are paid in full, we agree to pay you the profits that have accrued to you on these sales; first deducting from said profits any losses that may have occurred on such sales, if there be any, from the amount of the profit due you on this group; the same method to be pursued in regard to the two remaining groups, maturing May 1st and in the fall of 1900.

"We are to prepay freights when necessary to consummate sales of any of the goods, charging you interest on said freights from the dates paid until the maturity of the contracts, and all over prices named above freights and interest to be your profit on sales, subject to the above provisions agreed upon as to your guarantee on same.

"The amount of goods to be furnished by us on this contract is to be 3,000 tons of the various grades of dissolved bone and acid phosphates, and 1,000 tons of the various grades of fertilizers, that is, 4,000 tons in the aggregate.

"On January 1st, 1900, if the above amount of goods has not been placed by you, we are to have the option of cancelling the balance of the contract, if so desired by us, or adding to same if the above amount has then been placed.

"All contracts to be taken on your forms, and when goods are sold on time, as far as possible with planters' notes as collateral security to the notes of the purchasers, and said contracts are to be submitted to this company for approval, they having the right of rejecting any contracts not satisfactory to them, and not to be bound to fill any contracts so rejected.

"You hereby agree to procure from the proprietor of the Etiwan Phosphate Works a lease of said plant for the ensuing season; that the question of the use of their brands by you may be legally established, should it become necessary.    IMPERIAL FERTILIZER COMPANY,

By G. Walter McIver, Treasurer."

"The above is accepted upon the terms and conditions stated therein.    WILLSON GRIFFITH, Lessee."

From Circuit decree, defendants appeal.

*Messrs. Mitchell & Smith,* for appellants, cite: *As to contracts for personal services:* 24 Fed. R., 383 ; 20 Ency., 2 ed., 27 ; 155 Mass., 253 ; 149 N. Y., 489 ; 7 Ency., 2 ed., 147. *Imperial Co. not estopped from setting up this defense by its conduct:* 11 Ency., 2 ed., 436-438 ; 149 U. S., 293 ; 57 S. C.,

518; 48 S. C., 271; 41 S. C., 181; 28 S. C., 343; 26 S. C., 186; 13 S. C., 370; Big. on Est., 3d ed., 550; 60 N. Y., 413; 34 N. Y. Supp., 152. *As to waiver of Imperial Co. to require Griffith to obtain right to use Etiwan brands:* 28 Ency., 1 ed., 531; 54 S. C., 603; 30 N. Y., 164; 81 N. Y., 410. *Contract being non-assignable, Smith received no interest thereunder, and hence no responsibility:* 127 U. S., 387; 133 U. S., 489; 152 U. S., 651; 2 Ency., 2 ed., 1018. *Conclusion by master confirmed by Judge and not excepted to, is final:* 3 Brev., 389; 4 McC., 183; 45 S. C., 405; 46 S. C., 192. Bus. on Insanity, 277, 180. *As to amplifying an exception:* 20 S. C., 190; 60 S. C., 67.

. *Messrs. Nathans & Sinkler,* contra, cite: *Exception referring to exception to master's report is too general:* 16 S. C., 164; 18 S. C., 230; 42 S. C., 447. *Contract for personal services may be assigned by assent of parties:* 133 U. S., 489; 152 U. S., 651. *As to liability of defendant companies:* Pom. Eq. Jur., secs. 1097, 1024, 1902; 35 S. C., 422; Story Eq. Jur., sec. 464. *Contract of personal nature may be modified:* 133 U. S., 488; 152 U. S., 651.

November 27, 1903. The opinion of the Court was delivered by

MR. JUSTICE WOODS. On June 26th, 1899, the Imperial Fertilizer Company made a contract with Willson Griffith for the sale of four thousand tons of fertilizers. The terms and prices are set forth in detail in the letter from the company to Griffith making the proposition. This letter and Griffith's note of acceptance being essential to an understanding of the issues involved, will be found in the report of the case. The contract contemplated that Griffith, who was a fertilizer salesman of fine judgment and high character, should sell the fertilizers at an advance on the prices he was to pay, and the difference was to constitute his profit. As each separate sale was made and reported by him, the goods were to be shipped as he directed and charged to him on the Imperial

Company's books at the contract price.   The company was to hold all notes and accounts taken by him as collateral to be credited on his debt when collected, and all cash payments made by customers were to be remitted to it for like credit. All credit sales were to be subject to the approval of the company.   The contract does not expressly stipulate that the fertilizers should be delivered under the brands of the Etiwan Phosphate Works, but this is implied by the last clause, which was to the effect that Griffith was to procure "from the proprietor of the Etiwan Phosphate Works a lease of said plant for the ensuing season, that the question of the use of their brands by you may be legally established should it become necessary."   The Etiwan Company had ceased to manufacture, but its brands were popular, and it was expected their use would aid Griffith to resell the goods at a profit.   In the contract he is spoken of as "lessee," the reference being to his supposed lease and control of the Etiwan brands.   The Imperial Fertilizer Company had the option of cancelling the contract as to all goods not sold by January 1st, 1900, "or adding the same if the above amount has then been placed."

After Griffith had sold seven hundred and eighteen tons of the four thousand, his friends and business associates observed a marked decline in his physical health, accompanied by some eccentricity of conduct.   For this reason, G. Walter McIver, manager of the Imperial Fertilizer Company, became much concerned on account of the company's interest in this contract, and consulted with Griffith's sister and some of his friends as to the best course to be pursued. It seems all concurred in the opinion that he would not be able to carry on his business for several months at least, and that it would be necessary for him to appoint an agent to act for him.   Griffith acquiesced in this conclusion, and on October 10th, 1899, assigned his interest in the contract to W. I. Smith, then a bookkeeper of Imperial Fertilizer Company, and on October 13th, 1899, expressed his intention that Smith should act for him under the assignment by executing

a power of attorney authorizing him, among other things: "To manage, conduct and carry on my business concerning phosphates or fertilizers, removing, employing or substituting agents under him. * * * To settle and to compromise, and to submit to arbitration all accounts to claims and disputes between me and any other person arising in or out of said business. To make new contracts and agreements, or continue old ones with any person, firm or corporation, as the conduct of my said business and affairs may, in his best judgment, require." McIver, in the interest of his company, energetically advocated this action by Griffith and had the papers prepared. The price of fertilizers rose in the autumn of 1899, and late in November of that year Smith, while the market was advancing, released to the Virginia-Carolina Chemical Company, which in the meantime had purchased all the assets and stock of the Imperial Fertilizer Company, all Griffith's interest in the contract, for the consideration of a profit of seventy-five cents per ton for the unsold portion of the four thousand tons, amounting in the whole to $2,432.25.

On April 25th, 1900, Griffith was declared a lunatic, and the plaintiff, who was appointed his committee, immediately commenced this action for a general accounting by Smith as attorney in fact, and particularly to require Smith and Imperial Fertilizer Company and Virginia-Carolina Chemical Company to account for the true value of Griffith's interest in the contract sold and released to Virginia-Carolina Chemical Company, it being alleged in the complaint that his interest was sold at much less than its real value. The cause was referred to G. H. Sass, Esq., master, who reported, among other things, that with reasonable diligence Smith could have realized fifty cents per ton more than he received, and that he should be held liable for this neglect. As to the other defendants, the master holds that they acted in their own interest in dealing with Smith, without unfairness or impropriety, and are, therefore, not responsible to plaintiff. The Circuit Judge modified the report of the

master, and found that the Imperial Fertilizer Company and the Virginia-Carolina Chemical Company were also liable for the true value as fixed by the master, on the ground that they occupied a fiduciary relation to Griffith, that the circumstances indicated Smith was their agent as well as the agent of Griffith, and, therefore, they could not purchase from him.

There are many exceptions, but the only two questions involved in this appeal are: (1) Did Smith under all the circumstances exercise reasonable care and prudence in making the sale, and if not, what was the resulting loss for which he is liable; and (2) Did the Imperial Fertilizer Company and the Virginia-Carolina Chemical Company, or either of them, occupy such fiduciary relation to Griffith or Smith as to make them jointly liable with Smith for any loss arising from the inadequacy of the price?

In endeavoring to determine whether Smith is liable, it is necessary to consider the obligations he assumed to Griffith and his rights at the time he made the release, as against the Imperial Fertilizer Company, or rather the Virginia-Carolina Chemical Company, which had by purchase assumed the position of the Imperial Fertilizer Company. The terms of the power of attorney indicate the expectation, at least, that Smith as agent was to carry on the business on the same plan that Griffith himself had initiated, and he did sell on this plan a small quantity of fertilizers. Nevertheless, the evidence makes it very clear he exercised good judgment in not continuing this plan. Prices had advanced, under conditions somewhat abnormal, to such extent that he was in a position without incurring further expense to dispose of the entire thirty-two hundred tons remaining unsold, at a good profit; whereas, if he had waited to sell to the country trade with the usual proportion of credit sales, he would have run the risk of much loss from bad debts, and the still greater peril of a decline in prices. It is also to be borne in mind that the company had the power to reject any credit sales he might make. In addition, it

should be observed he had a very short time to learn the bearings of the business and dispose of the goods in the country before January 1st, 1900, and on that day the contract would have been subject to forfeiture at the option of the Virginia-Carolina Chemical Company.

The same risks would have been incurred in turning over the contract to Mr. Earle Sloan, who wished to undertake its performance on Griffith's part, in order that he, as part owner and manager of the Etiwan Phosphate Works, might keep its brands on the market, and at the same time, as Griffith's friend, conserve his interests.   Aside from the letters of Sloan to the president of the Virginia-Carolina Chemical Company, which were excluded by the master as incompetent, the evidence of McIver, and Sloan's letter to Messrs. Mitchell and· Smith, make it manifest there was such lack of confidence and acute business antagonism between him and the managers of the Imperial Fertilizer Company and the Virginia-Carolina Chemical Company, as to forbid any hope that this business, which involved in the credit sales of fertilizers so much reciprocal confidence, could have been successfully transacted between them.   Besides, Smith could not have forced the Virginia-Carolina Chemical Company under a contract of this kind to accept Sloan or any one else as a substitute for himself.   Another difficulty under which Smith would have labored, if he had endeavored to continue the business on the plan upon which Griffith had begun it, was the doubt as to his right to use Etiwan brands.   He could find no written authority to use them, among Griffith's papers, and we think the letter of Sloan, the manager of the company, to McIver, claiming the right to terminate their use at his demand, was clearly competent, not to prove that Sloan had this right, but to show that Smith had reason to apprehend that he might make such claim, which would seriously embarrass him, in view of the fact that he could not meet it by written authority from the Etiwan Company.

The defendants have moved in this Court to amend subdi-

vision 3 of the second exception, so as to make the point that the letters of Earle Sloan to Morgan, president of the Virginia-Carolina Chemical Company, should have been admitted in evidence, as tending to show "that no use of the Etiwan brands or disposition of the unsold fertilizers, originally included in the agreement of June, 1899, was possible by W. I. Smith, assignee, and that any delay on the part of the said W. I. Smith, assignee, in effecting a settlement of the unsold portion of that contract would have been destructive of any remaining value thereof in his hands." In these letters, Sloan does propose to sell to the Virginia-Carolina Chemical Company the Etiwan works, with the right to use its brands for the year 1900, and we think they were competent to enlighten the Court as to the extent which the value of Griffith's claim to deliver the fertilizers under Etiwan brands might have been impaired in Smith's hands by an adverse claim. The motion to amend the exception was in effect only to amplify it and make it clearer. *Watts* v. *R. R. Co.*, 60 S. C., 67, 38 S. E., 240. The motion cannot be granted, however, for the reason that the letters were excluded by the master, and no exception was taken to his ruling.

Excluding these letters, upon the testimony to which no objection was made, we think Smith was without doubt justified in not running the risk of continuing the business on the plans laid out by Griffith. Indeed, as we understand, the plaintiff does not now seriously question the wisdom of a sale in bulk on the Charleston market, but it is insisted that if Smith had offered the goods to brokers, he could have sold for a better price than he received. Smith admits he made no effort to sell except to the Virginia-Carolina Chemical Company, and there seems to be no doubt that if he had thirty-two hundred tons of fertilizers for sale, free of any contract restrictions, he could with reasonable effort have made a cash sale at fifty cents per ton more than he received. The important inquiry, therefore, is: Did the Virginia-Carolina Company, as as-

signee of the Imperial Fertilizer Company, have such rights under Griffith's contract as to enable it to interfere in any way with his selling in open market in Charleston all the unsold goods?

Assuming the contract was of such a personal nature as to deny to Griffith the right to assign it and thus put in his place one with whom the Imperial Fertilizer Company would not care to deal in a relation implying so much confidence, the assignment to Smith was made with the company's active co-operation, and upon the very valuable consideration that by the assignment it was released from the embarrassment of being bound in a contract to furnish a large quantity of goods to Griffith, a man whose condition had become such as to place the company in a position of great uncertainty as to whether he would be able to take the goods or not. The company, therefore, waived the right of denying the validity of the assignment to Smith. But if the assignment is disregarded, the result would not be affected, because Smith had a power of attorney to act for Griffith under the contract, the validity of which has not been disputed. The question, then, of Smith's right to reassign the contract is of no practical importance, because if he as agent of Griffith had the right to demand of the Virginia-Carolina Chemical Company the delivery of the unsold fertilizer in bulk at the prices named in the contract, it is manifest he himself could have contracted for the sale of these goods, and directed the Virginia-Carolina Chemical Company to deliver them to the person purchasing from him.

This leads to the inquiry whether he could have demanded of the company the delivery of the unsold goods, without Etiwan brands and in bulk, upon payment of the agreed price in cash. The contract was for only one season, and the goods were not to be sold under Imperial brands; it is, therefore, obvious no future advantage to the company for any trade Griffith might establish was contemplated. Griffith contracted to procure a lease of the Etiwan Phosphate Works, so as to establish his right

to use the brands of that company, and it was understood the Imperial Company would place those brands on goods shipped out on Griffith's orders, but neither the Imperial Company nor the Virginia-Carolina Chemical Company had, when the contract was made, any interest in the Etiwan brands, and they have not since acquired such interest. The sacking and branding of the goods was a burden imposed on the Imperial Company by the contract, and there is not the slightest evidence that this burden ever became a benefit to it. It was, therefore, subject to waiver by Griffith. Hence, even if Griffith had no legal right to use these brands, as it is alleged was the case, this fact would be of no concern to the Imperial Fertilizer Company or its assignee, the Virginia-Carolina Chemical Company, if Griffith or his agent could effect a sale of the entire quantity without the brands. It seems perfectly clear that the sole interest the Imperial Company had in the contract was to secure the sale of four thousand tons of its goods at the prices therein stated, and to collect the purchase money, and all the duties the contract imposed on the parties were only means provided for the accomplishment of this end. Smith could have demanded the delivery for cash of all the goods, waiving the requirement that Etiwan brands should be used, and the condition that he might sell on credit.

We suppose it will hardly be contended that the Imperial Company had the option to require Griffith or his agent, Smith, to undertake to sell some indefinite quantity of fertilizers beyond four thousand tons, after that quantity had been sold.

The testimony affords no ground for imputing bad faith, but we cannot avoid the conclusion that Mr. Smith as a business man should have known the Virginia-Carolina Chemical Company would be obliged to deliver the thirty-two hundred tons in bulk, without Etiwan brands, to his order, on payment of the purchase money; and that he should have offered the goods to the trade instead of restricting his negotiations to the Virginia-Carolina Chemical Company. He must,

therefore, be held responsible for the loss which resulted from his failure to do so. The fact that Griffith owed Imperial Fertilizer Company on transactions for past years about $25,000, does not enter into this question, because this debt was not in any way affected by the assignment and release made by Smith.

We are unable to find any sufficient basis for holding the Imperial Fertilizer Company and the Virginia-Carolina Chemical Company liable for the loss on the ground taken in the Circuit decree, that they occupied a fiduciary position, and that Smith was acting as their agent in this business. It is true, Smith was the book-keeper of the Imperial Fertilizer Company and afterwards shipping clerk of the Virginia-Carolina Chemical Company, but these positions do not imply agency to transact business of this character; and we find no evidence that any such trust was given by the companies or undertaken by him. McIver conducted for them all the negotiations and transactions connected with the matter. It is true, he suggested that Griffith should give up his business until his health should improve and that in the meantime he should appoint Smith his agent, and he had the power of attorney and assignment prepared, but it was certainly made perfectly clear to Griffith, as well as to his sister and his friends, that McIver was acting for the Imperial Company, and in its interest. The fact that Smith was book-keeper for the Imperial Fertilizer Company was also well known to Griffith and his friends. McIver suggested that independent investigation should be made as to his capacity and character. The master found "that at the time that Mr. Griffith made this assignment and power of attorney, he was mentally competent to do so, and while he was not in his usual health, there was no reason to suppose that he was not fully aware of the force and effect of his actions, and that the said assignment and power of attorney were properly executed by him, without any undue influence being brought to bear upon him in the premises." This finding was not disturbed by the Circuit Judge, and we think

it is supported by the evidence. That Smith was in the employment of the companies interested of which McIver was manager, and that they were advised by the same attorney, made their relations sufficiently delicate to warrant careful scrutiny of their dealings and the exaction of more than ordinary candor and fairness; but these facts alone, in the absence of such gross inadequacy of price as to be suggestive of fraud, are not sufficient to make the Virginia-Carolina Chemical Company liable for buying at a price somewhat below the market value. Not only is there lack of evidence of collusion, but Smith assumes the whole responsibility of the transaction, and says he acted independently of McIver, refused to accept his first offer, and traded with him only after trying to bring him to a higher price than he obtained. McIver had a right to buy at the lowest price to which he could get Smith to agree, in the absence of fraud or imposition; and there is nothing in the evidence to suggest any inference of that kind. Smith made a bad trade, because, as we have seen, he did not use proper efforts to get a better one, but there is no evidence that McIver persuaded or influenced him not to make such efforts. Looking at the situation of affairs from the company's point of view, McIver seems to have conceived the idea that Smith could not sell the fertilizers without the Etiwan brands, and without following out the provisions of the contract which had been inserted solely for the purpose of obtaining sale and payment. This view was so clearly erroneous, that Smith from his point of view of Griffith's representative should have rejected it, but there is no reason to doubt McIver honestly entertained it, and there was no impropriety in his urging it in the negotiations.

For these reasons, the judgment of the Circuit Court is modified as above indicated, and the report of the master is confirmed.